**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA JEAN FALZINI, | ) | CASE NO. 1:16CV02779 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Donna Jean Falzini ("Plaintiff"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final decision be

VACATED and this matter REMANDED for further proceedings.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

## I.   PROCEDURAL HISTORY

On March 13, 2013, Plaintiff filed applications for POD and DIB, and on July 31, 2013 she filed for SSI, alleging a disability onset date of March 13, 2013.  (Transcript ("Tr.") 318-319, 414-425).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 344-350, 353-364, 365-366).

On August 12, 2015, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 249-276).  At the hearing, Plaintiff amended her onset date to November 13, 2013.  (Tr. 254-55, 434).  On September 9, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 229-248).  The ALJ' s decision became final on November 18, 2016, when the Appeals Council declined further review.  (Tr. 1-7).

On November 15, 2016, Plaintiff filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9. 10). Plaintiff asserts the following assignments of error:

(1)     The ALJ failed to properly weigh the medical opinion evidence

(2)     The ALJ failed to properly evaluate Plaintiff's credibility

(Doc. No. 9 at 2).

2

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in 1961 and was 52 years-old at the time of her alleged onset date.  (Tr. 443).  She has a high school education and is able to communicate in English.  (*Id.*).  She has past relevant work operating her own home daycare.  (Tr. 253, 255, 446, 456).

### B.    Medical Evidence

On June 12, 2012, Plaintiff presented to Eugene S. Balkovec, D.O., complaining of fibromyalgia pain in her hips, shoulder, arms, and joints.  (Tr. 551).  Plaintiff reported doing well with Advil.  (Tr. 551).  A physical examination revealed several varicose veins in the proximal right leg.  (Tr. 552).  Dr. Balkovec diagnosed hypertension and generalized anxiety, and he prescribed medication.  (Tr. 552-553).  On March 12, 2012, Plaintiff reported continued back and neck pain and limited movement of her back and neck.  (Tr. 548).  She noted that her radicular pain occurred with various types of movement, including heavy lifting.  (Tr. 548).  She also complained of decreased range of motion in her cervical spine.  (Tr. 548).  Dr. Balkovec diagnosed degeneration of the cervical disc, generalized anxiety, and hypertension.  (Tr. 549).

An MRI of Plaintiff's cervical spine dated May 25, 2013 revealed moderate degenerative disc disease of the lower cervical spine with no focal protrusion or extrusion.  (Tr. 517).

On October 17, 2013, Plaintiff established care with Baran Onder, M.D.  (Tr. 745).  Dr. Onder noted a history of cervical degenerative disc disease and that she was applying for disability benefits.  (Tr. 745).  Plaintiff reported severely restricted range of motion of the neck and frequent neck pain and headaches.  (Tr. 745).  A physical examination revealed good ambulation, supple neck with full range of motion, full range of motion of the extremities, and

3

normal extremity strength.  (Tr. 747).  Dr. Onder diagnosed degenerative disc disease (cervical), and he discussed yoga as a a treatment option.  (Tr. 747).

On November 22, 2013, Plaintiff presented to Dr. Onder, complaining of recurrent and significant axial neck pain without radiculopathy, and she noted pain with any movement.  (Tr. 751).  Plaintiff reported having tried home exercises that her doctor recommended, but she claimed they made the problem worse.  (Tr. 751).  Physical examination revealed good ambulation, markedly limited neck range of motion, normal extremity range of motion, and normal extremity strength.  (Tr. 752).  Dr. Onder referred Plaintiff to physical therapy.  (Tr. 753).

On December 16, 2013, Plaintiff reported to Dr. Onder that she did not like physical therapy but that it seemed to help her.  (Tr. 756).  On examination, Plaintiff exhibited full neck range of motion, full extremity range of motion, and normal extremity strength.  (Tr. 757).

Plaintiff presented for follow up on February 14, 2014.  (Tr. 765).  She reported that her neck pain was unchanged.  (Tr. 765).  She noted her last physical therapy appointment was difficult for her and that she was "in tears."  (Tr. 765).  Dr. Onder determined that Plaintiff was not a good candidate for surgical intervention due to the absence of radicular symptoms.  (Tr. 765).  He also thought that facet injections were inadvisable as they were not covered by insurance and only a temporary solution.  (Tr. 765).  Physical examination revealed good ambulation, straightening of cervical lordosis, limited and painful neck range of motion, limited side bending, full extremity strength and range of motion, and a normal gait.  (Tr. 766).  Dr. Onder ordered a functional capacity evaluation in order to more accurately complete Plaintiff's disability forms.  (Tr. 767).

4

X-rays of Plaintiff's lumbar spine dated February 22, 2014 revealed minimal left lateral curvature, mild degenerative changes of the L4-L5 and L5-S1 apophyseal joint, and minimal endplate osteophytosis at L1-L2 and L3-L4.  (Tr. 703).

On February 26, 2014, presented to Dr. Onder, complaining of a burning sensation in her bilateral hands.  (Tr. 770).  Plaintiff complained that her symptoms had gotten progressively worse over the previous six to eight months and that she had been dropping things recently.  (Tr. 770).  On examination, Plaintiff was intermittently tearful, she complained of generalized pain, and she was unable to tolerate many portions of the physical exam.  (Tr. 771).  Plaintiff exhibited full range of motion at the wrist and elbow.  (Tr. 771).  Strength of the dorsal interossal muscles appeared to be preserved.  (Tr. 771).  Plaintiff exhibited diminished finger grasping bilaterally, but it was unclear whether it was due lack of effort because of pain or true weakness.  (Tr. 771).  Dr. Onder expressed doubt that Plaintiff's hand symptoms were related to radicular pain from her neck.  (Tr. 772).  He recommended that Plaintiff undergo EMG testing.  (Tr. 772).

On April 28, 2014, Plaintiff followed up for aches and pains in her joints.  (Tr. 775).  She reported that her prior physician diagnosed her with fibromyalgia.  (Tr. 775).  Physical examination revealed good ambulation and full strength and range of motion in her extremities.  (Tr. 776).  Dr. Onder noted that Plaintiff exhibited multiple tender trigger points on bilateral upper and lower extremities.  (Tr. 776).  She reportedly did not tolerate external rotation of her hip due to pain.  (Tr. 776).  She otherwise exhibited relatively good hip range of motion.  (Tr. 776).  Dr. Onder planned to have Plaintiff undergo a rheumatology work-up because her pain was out of proportion with the physical examination.  (Tr. 776).

5

On June 23, 2014, Plaintiff presented to Dr. Onder, reporting an earlier sharp pain in her head which had since resolved.  (Tr. 781).  She did not have any particularly excessive neck pain at that time, and she noted that exercise was helping her continued hip pain.  (Tr. 781).  Examination revealed good ambulation, full range of motion of the neck, full range of motion of the extremities, normal extremity strength, a normal gait, normal reflexes, and a normal sensory exam.  (Tr. 782).

On July 15, 2014, Plaintiff was seen by Benjamin Abraham, M.D., for a pain management consultation.  (Tr. 687).  She complained of aching and burning pain in her neck, lower back and hips, which she rated at ten on a ten point scale, despite using tramadol.  (Tr. 687).  She stated that her pain was exacerbated by standing and by the weather, and it was mitigated by taking a hot bath.  (Tr. 687).  Dr. Abraham reviewed x-rays of Plaintiff's lumbar spine and the MRI of her cervical spine.  (Tr. 688-689).  Physical examination revealed normal and symmetric bilateral upper and lower extremity strength; no atrophy or tone abnormalities; no pain with neck flexion; pain to palpation over the cervical and lumbar paraspinal muscles; negative straight leg raising; positive facet loading bilaterally; pain-free and full peripheral joint range of motion; and antalgic gait.  (Tr. 691).  Dr. Abraham noted that Plaintiff met the clinical diagnostic criteria for fibromyalgia.  (Tr. 691).  Plaintiff was not interested in a trial of Tai Chi, which is a known therapy for that condition.  (Tr. 691).

On July 22, 2014, Plaintiff contacted Denise A. Anderson, R.N, and reported that her medication amiltripyline was not helping.  Plaintiff noted that she fell twice and felt like she was "walking in a cloud, yelling, and crying."  (Tr. 697).  Plaintiff was advised to discontinue her medication.  (Tr. 697).

6

On August 6, 2014, Plaintiff presented to Dr. Onder for chronic pain and fibromyalgia symptoms, including a burning pain in her limbs.  (Tr. 787).  Dr. Onder noted that Plaintiff's pain management provider wanted her to start on a medication called Savella, but insurance did not cover it.  (Tr. 787).  Plaintiff discontinued amiltripyline because of serious side effects including dizziness, drowsiness, and falling, and she declined further follow-up with the pain management provider.  (Tr. 787).  However, Plaintiff noted that tramadol had been "taking the edge off the pain."  (Tr. 787).  Plaintiff also had been participating in "gentle yoga," but it reportedly exacerbated her shoulder pain.  (Tr. 787).  A physical examination revealed good ambulation, marked tenderness to palpation of her neck, normal extremity strength, and full range of motion.  (Tr. 788).

On October 29, 2014, Plaintiff presented with lumbar pain and a number of other issues. (Tr. 801).  She complained of her neck "popping" in weeks previous, which caused her severe pain; pain in her right lumbar area radiating down the posterior aspect of her right thigh; and diffuse pain everywhere else.  (Tr. 801).  Physical examination revealed good ambulation, full range of motion of the neck, full range of motion of the extremities, normal extremity strength, a normal gait, and intact sensation.  (Tr. 802-803).  Dr. Onder diagnosed lumbar radiculopathy, noting that because it was improving, Plaintiff was content to "deal with it."  (Tr. 803).  As for the issues relating to her cervical spine, Dr. Onder referred Plaintiff for pain management, but she declined to go, stating that she could not drive.  (Tr. 803).  When advised she could take a bus, Plaintiff also declined.  (Tr. 803).

On February 9, 2015, Plaintiff complained of recurrent fibromyalgia flares.  (Tr. 706). She reported aching in multiple muscles and joints, which had slowly resolved but were

7

followed by extreme fatigue.  (Tr. 706).  It was noted that a rheumatology workup was unremarkable.  (Tr. 706).  Plaintiff reported that she missed an appointment with a rheumatologist due to inclement weather.  (Tr. 706).  Physical examination revealed good ambulation and transfer, normal extremities with full range of motion, and five out of five strength; tenderness to palpation over the first carpometacarpal ("CMC") joint of the bilateral thumbs with right, greater than left; positive grind test in the right CMC; positive Phalen's test and carpal tunnel compression test on the right, and diminished sensation to light touch in the middle and ring finger of the right hand.  (Tr. 707).  Diagnoses included fibromyalgia and pain in the wrist.  (Tr. 708).

On February 25, 2015, Plaintiff complained of worsening bilateral hip and thigh pain.  (Tr. 711).  She reported difficulty walking and increased pain and numbness in her feet while sleeping.  (Tr. 711).  It was noted that Lyrica was not covered by her insurance and she was unable to tolerate several other medications due to side effects.  (Tr. 711).  Physical examination revealed an antalgic gait, tenderness to palpation at the right and left hips, decreased ankle reflexes on the right, absent ankle reflexes on the left, decreased strength in the bilateral lower extremities, and positive straight leg raise test to 45 degrees on the right and 55 degrees on the left in supine position.  (Tr. 712-713).  Diagnoses included trochanteric bursitis, lumbar radiculopathy, and fibromyalgia.  (Tr. 714).  Plaintiff had corticosteroid injections in her bilateral hips, and she was prescribed Gabapentin.   (Tr. 714).

On March 20, 2015, Plaintiff presented to Dr. Ondar complaining of "pain all over," bilateral hip pain, right hip pain radiating from one buttock to the lateral thigh, and bilateral feet numbness at night.  (Tr. 718).  She recalled having fallen one month earlier after slipping on ice

8

and landing on her buttocks, and she complained of pain all the way up her spine into her neck. (Tr. 718).  Physical examination revealed no pain to palpation of vertebrae, normal motor and sensory functioning, slight decrease sensation in right foot, and slight decrease in sensation and flexion/extension of right great toe.  (Tr. 719).  Plaintiff was able to get on and off the exam table without pain or restriction in range of motion, and she was able to cross her legs and take off her socks without evidence of pain or restricted range of motion.  (Tr. 719). Her gait and reflexes were normal.  (Tr. 719).

On June 22, 2015, Plaintiff presented a variety of concerns for Dr. Onder, including diffuse muscle pains and weakness.  (Tr. 838).  On examination, Plaintiff ambulated well, and exhibited normal extremity strength and full extremity range of motion.  (Tr. 839). On July 7, 2015, Plaintiff exhibited similar results on examination.  (Tr. 846).

On August 24, 2015, Plaintiff returned to Dr. Onder, complaining of left forearm and elbow pain (Tr. 854). On examination, Plaintiff ambulated well, exhibited pain to palpation over her left elbow, but full extremity range of motion, including normal elbow range of motion, and normal extremity strength (Tr. 854).

**C.      Opinion Evidence**

On October 15, 2013, Plaintiff presented to Dorothy A. Bradford, M.D., for a consultative evaluation.  (Tr. 654).  Plaintiff's complaints included degenerative joint disease in her lower cervical spine for four years; constant pain and an inability to move her neck; and pain in her lower back.  (Tr. 654).  She noted no trouble using her hands and no radiation of pain down the arms.  (Tr. 654).  Plaintiff stated that she continued to drive.  (Tr. 654).  On examination, Plaintiff had normal station, posture, and gait.  Her neck movements were severely

9

restricted in all directions.  (Tr. 656).  She exhibited normal stability strength and tone.  (Tr. 656).  Plaintiff exhibited full range of motion of her lower spine and hips, slightly weak grasping in her hands, full extremity range of motion, and normal strength and stability in her extremities.  (Tr. 656).  There were no neurological deficits.  (Tr. 656).  X-rays the lumbar spine revealed mild degenerative joint disease and preserved disc spaces.  (Tr. 659).

On October 30, 2013, State agency non-examining physician, Rannie Amiri, M.D., reviewed Plaintiff's medical file and opined that she could perform light work, but she could never climb ladders, ropes, or scaffolds; she could only crawl occasionally; she could frequently handle objects; and she must avoid all exposure to hazards.  (Tr. 301-303).

On February 6, 2014, a different State agency physician, Robert Wysonkinsi, M.D., reviewed Plaintiff's medical file and concurred with the limitations assessed by Dr. Amiri, except that he also limited Plaintiff to frequent overhead reaching.  (Tr. 326-328).

On March 4, 2014, Dr. Onder completed a Multiple Impairment Questionnaire, listing Plaintiff's diagnoses which consisted of cervicalgia, lumbago, cervical degenerative disc disease, anxiety/depression, and wrist pain of unclear etiology.  (Tr. 668).  Dr. Onder opined that as a result of Plaintiff's impairments, during an 8-hour workday, she could sit for two hours total, stand/walk one hour or less total, and must get up every 30 minutes when sitting and move around (Tr. 670) and she could lift/carry up to 10 pounds frequently and 10 to 20 pounds occasionally (Tr. 671).  He further opined that she had significant limitations performing repetitive reaching, handling, fingering, or lifting (Tr. 671); that she had "moderate" limitations in the ability to use the arms and hands to grasp, turn, and twist objects, that she had moderate limitations using the fingers/hands for fine manipulations; that she had moderate limitations

10

reaching including overhead (Tr. 671-672); and that her symptoms were likely to increase in a competitive work environment.  (Tr. 672).

He further opined that Plaintiff's symptoms were frequently severe enough to interfere with her attention and concentration (Tr. 673); that depression and anxiety, in addition to psychosocial stressors, contributed to the severity of her symptoms and functional limitations (Tr. 673); that she would need to take unscheduled rest breaks every 30-60 minutes during an 8-hour workday (Tr. 673); and that she had good and bad days.  (Tr. 674).

In a letter dated March 5, 2014, Dr. Onder reported treating Plaintiff for several medical conditions, including pain in her neck, resulting from degenerative disc disease in the lower cervical spine.  (Tr. 677).  He noted that Plaintiff had limited response to pain medication, anti-inflammatories, and physical therapy.  (Tr. 677).  Dr. Onder opined that Plaintiff was unlikely to be able to engage in the physical demands of her past work.  (Tr. 677).

He also found that there was a "strong psychological component to the patient's pain complaints that make her problem worse and is impairing her recovery."  (Tr. 677).  He further noted valid concerns regarding Plaintiff's her self-reported levels of pain and her ability to live independently – hasically having rated herself as "crippled" on her FCE.  Dr. Onder observed that there is "no objective evidence of why [Plaintiff] should be having so much lower back pain or wrist pain . . . other than some mild lumbar spine arthritis which is typical for someone of her age." (Tr. 677).  However, it was difficult, he noted, to reach any conclusion as to the origin of her pain because Plaintiff declined to let him examine her on account of the pain. (Tr. 677-678).

August 11, 2015, Dr. Onder assessed Plaintiff with the same physical and functional limitations as those he assessed in March 2014.  (Tr. 735).

11

D.      **Hearing Testimony**

During the administrative hearing, Plaintiff testified to the following:

- Plaintiff last worked as a home daycare provider in November 2013.  (Tr. 255).
  She stopped working because of aches and pain, which prevented her from
  caring for the children.  (Tr. 256-257).

- She described constant, achy, burning pain in her neck and pain in her arms and
  hands which made it difficult to hold a book or the phone.  (Tr. 259-260).  She
  described difficulty moving side to side.  (Tr. 260).  She noted flare-ups of pain
  that felt like "every joint" was on fire, which lasted up to 2-3 weeks at a time.
  (Tr. 261).

- Plaintiff is left-handed.  She stated that her left hand and arm "seem not to want
  to work anymore."  (Tr. 261-262).  She noted that she had difficulty opening jars
  and must eat with her right hand at times.  (Tr. 262-263).  Plaintiff had constant,
  aching lower back pain that would shoot down her right leg.  She also noted
  pain in her hips.  (Tr. 263-264).  Plaintiff estimated that she can stand for 10
  minutes at a time, and walk around the block on a good day.  (Tr. 267-268).  She
  reported severe pain when sitting in a chair for approximately 30 minutes.  (Tr.
  268). She said she was unable to lift or carry 7 pounds.  (Tr. 268-269).

- She reported depression, high anxiety, and constant worry.  (Tr. 265).

- Plaintiff reported living alone but noted that her daughter comes over to do
  vacuuming, mopping, and laundry.  (Tr. 257).  Plaintiff said she can do light
  dusting and prepare simple meals. (Tr. 257).  She only drives locally, to medical
  appointments and to the grocery store or pharmacy.  (Tr. 258).  At times, she
  needs assistance with drying her hair. Id.

- In a typical day, Plaintiff does some stretching before getting out of bed, and she
  has a light breakfast.  (Tr. 259).  She sets "tiny goals" throughout the day, such
  as trying to walk around the block or reading a chapter of a book.  (Tr. 259).
  She is unable to do yard work, but sits outside in the sun.  (Tr. 260).

- Plaintiff's medication causes nausea.  (Tr. 264).  Cortisone shots provided about
  a month and a half of pain relief.  She has problems sleeping because she must
  turn from one side to the other during the night when she is awakened by pain.
  (Tr. 264).  She sleeps approximately 4 hours a night.  (Tr. 269). She takes at
  least one nap during the day, for about an hour at a time.  (Tr. 269).

The ALJ concluded that Plaintiff had past work as a home daycare provider (child monitor).  The VE testified that an individual of Ms. Falzini's age, education, and work history would have no transferable skills to any type of sedentary work.  (Tr. 271).  The ALJ then posed the following hypothetical question:

> . . . if you would consider a person of the claimant's age, education and past relevant work activity with the capacity for light work who could never climb ladders, ropes  or scaffolds, but could occasionally crawl, who has the ability to frequently handle and reach overhead with bilateral upper extremities, but who would have to avoid all exposure to hazards defined as industrial machinery, unprotected heights, commercial driving and other similar things.

(Tr. 271-272).  The VE testified that such a person could not perform Plaintiff's past work.  (Tr. 271-272).  However, he explained that she could perform work as a cashier, a sales attendant, or a mail clerk.  (Tr. 272).

On cross-examination, the VE stated that the aforementioned jobs generally required standing and lifting more than 10 pounds.  (Tr. 273).  If the individual were limited to occasionally handling, fingering, and feeling, she would not be able to perform the identified jobs.  (Tr. 273).  Further, if the individual required a break every 30-60 minutes, lasting 10-15 minutes each time before returning to work, she would likely be precluded from all work.  (Tr. 273-274).  The VE also stated that if an individual were off task for 20 percent of the workday, she would likely be precluded from work, "especially in your lesser skilled jobs." (Tr. 274).  If an individual could only sit for 2 hours and stand/walk no more than 1 hour per day, she would be precluded from all full-time competitive jobs.  *Id.*  Finally, cross-examination also revealed that if an individual were absent from work three or more days per month, she would be precluded from all work.  (Tr. 274-275).

13

### III.    STANDARD FOR DISABILITY

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

14

2.    The claimant has not engaged in substantial gainful activity since November 13, 2013, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairment: disc disease of the cervical and lumbar spine (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can only occasionally crawl and never climb ladders/ropes/scaffolds. She can frequently perform the manipulative maneuvers of handling and reaching overhead with the bilateral upper extremities.  She must avoid all exposure to environmental hazards defined as industrial machinery, unprotected heights, commercial driving, and similar activities/environments.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 14, 1961and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 13, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 232-243).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

16

conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.**     **First Assignment of Error: The ALJ's assessment of Plaintiff's treating physician Dr. Onder**

In her first assignment of error, Plaintiff maintains that the ALJ erred by failing to provide good reasons for affording the opinion of Dr. Onder less than controlling weight.  For the reasons described below, the Court agrees.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[2]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408[3]; *See also Gayheart*,

---

[2] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[3] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

   If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating

physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[4]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

---

[4] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id*. § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

In the present case, the ALJ's reasoning for discounting Dr. Onder's opinion falls short. The ALJ first observed that "[a]lthough a treating physician, Dr. Onder completed the questionnaire, after only a few months of treatment with the claimant, and he based the assessment not on his own examinations and clinical findings, but on the notes from a previous physician."  (Tr. 240).  Further, the ALJ noted that "the physical examination of the claimant had been difficult due to her unwillingness to participate, and she was frequently crying during visits due to her disability or perceived disability."  (Tr. 240).  The ALJ reasoned that "[t]he accuracy of this questionnaire is therefore questionable," and she gave it little weight.  (Tr. 240).

The reasons provided by the ALJ do not amount to "good reasons" under the standard established by the regulations and the case law described above.  First, there is nothing unusual about the practice of one physician reviewing the treatment notes of another physician as a means of understanding a patient's medical history and current medical condition.  A physician who did not conduct such a review would likely face a malpractice claim.  Moreover, state agency physicians consider other physicians' notes exclusively as a matter of standard practice. Here, to the extent that the ALJ's opinion suggests otherwise, the Court finds nothing questionable about Dr. Onder's consideration of Plaintiff's earlier treatment notes.

Additionally, there is no substantial basis for the ALJ's assertion that Dr. Onder *only* considered another physician's notes, and not his own, when assessing Plaintiff's functional capacity.  The Court has closely reviewed the questionnaire, and it is evident that the ALJ misunderstood Dr. Onder's answers.  Indeed, a cursory review of the questionnaire reveals that Dr. Onder's assessment was based on his own examination of Plaintiff.  The questionnaire generally sought information relating to the limitations arising from Plaintiff's medical

21

conditions, and Dr. Onder was specifically asked to identify Plaintiff's diagnoses, symptoms, clinical findings, and physical and mental limitations, among other things.  For instance, Question 4 asked Dr. Onder to "[i]dentify the positive clinical findings that demonstrate and/or support your diagnosis and indicate location where applicable."  (Tr. 668).  In response, Dr. Onder wrote:

> Sever[e]ly restricted range of motion of neck.  Difficult overall physical exam due to patient unwilling to participate in examination due to fear of increased pain.  Patient frequently crying at office visits due to pain and disability or perceived disability. Undetermined strength throughout body due to "break away" pain with manual muscle testing. Decreased manual dexterity.  Decreased lower extremity flexibility.  Decreased grip strength.  Patient reports severe level of depression and moderate level of anxiety.

(Tr. 668-669).

This passage demonstrates, contrary to the ALJ's conclusion, that Dr. Onder considered "his own examinations and clinical findings" when assessing Plaintiff's functional capacity.  A review of the medical record establishes that Dr. Onder treated and examined Plaintiff on a number of occasions between October 17, 2013 and March 4, 2014, the date he filled out the questionnaire.  Moreover, it is evident that in providing treatment, Dr. Onder made his own clinical findings and produced numerous treatment notes, which are part of the case record.  The Court has carefully reviewed these records, and it finds that there is no evidence to reasonably support the ALJ's conclusion that Dr. Onder did not consider his own notes and his own findings when evaluating Plaintiff's functional capacity.

The ALJ's impression that Dr. Onder did not rely on his own notes and findings seems to arise from Dr. Onder's answer to Question 29, which asked the following:

> In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?

(Tr. 674).  In response, Dr. Onder wrote "June 28th, 2011," and he indicated that the "above date [is] based on notes from previous physician who is currently retired."  (Tr. 674).  It is evident, based on this answer, that Dr. Onder did consider the treatment notes of Plaintiff's previous physician, but he did so only insofar as he was being asked to make a medical judgment about Plaintiff's condition during the time period that preceded her treatment with him.  This answer cannot be reasonably construed to mean that Dr. Onder considered another physician's notes to the exclusion of his own.

The Court rejects the Commissioner attempts to rehabilitate the ALJ's reasoning.  It is well-settled that the Commissioner may not cure a deficient opinion by offering explanations never offered by the ALJ.  As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  Further, the Commissioner is incorrect to maintain that the ALJ "noted [that] Dr. Onder relied on the treatment notes of previous physicians in concluding that Plaintiff's limitations applied since June 28, 2011."  (Doc. No. 10 at 12).  The ALJ concluded that Dr. Onder relied exclusively on another doctor's findings.  Nowhere in the administrative decision did the ALJ indicate an understanding that Dr. Onder's reliance on another doctor's notes and findings related to the time period before Plaintiff began treating with him.

The Court also concludes that the ALJ's second reason for discounting Dr. Onder's opinion is similarly inadequate.  The second reason, as stated by the ALJ, was that Dr. Onder

23

indicated that "the physical examination of the claimant had been difficult due to her unwillingness to participate, and she was frequently crying during her visits due to her disability or perceived disability."  (Tr. 240).  On this basis, the ALJ concluded that Dr. Onder's assessment was "questionable."  (Tr. 240).  This analysis also fails to meet the "good reasons" standard described above.  First, the fact that Plaintiff was crying during her visits has no apparent relevance to the weight to be afforded the Dr. Onder's opinion.  Second, the ALJ's reliance on Plaintiff's "unwillingness to participate" seems to be another misapprehension of the record.  What the ALJ and the Commissioner fail to mention, was that according to Dr. Onder's note, Plaintiff was "unwilling to participate in examination *due to fear of increased pain.*"  (Tr. 668) (emphasis added).  This is an important qualification, because it indicates that Plaintiff had an arguably legitimate reason for not participating.  The ALJ, rather than evaluating this evidence for what it was, simply ignored it.  An ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp.2d at 880 (citing *Bryan*, 383 Fed. Appx. at 148).  This Court accordingly concludes that the ALJ erred in her evaluation of Dr. Onder's opinion.

The central question with respect to whether a treating physician opinion deserves controlling weight is two-fold: an ALJ must consider whether it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and whether (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  In this case, the reasoning provided by the ALJ fails to adequately address either question.  By the Court's count, Plaintiff was seen by Dr. Onder over a dozen times between October 2013 and March 2015, and the treatment notes for these visits reflect numerous

24

abnormal findings. However, the ALJ mentioned only three of these doctor's visits, and it is not evident that the ALJ considered whether Dr. Onder's opinion is both supported by, and consistent with, the record as a whole. In sum, the Court finds that the ALJ failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996).

In light of the issues identified in relation to the ALJ's stated reasons for discounting Dr. Onder's opinion and the abnormal findings reflected in his treatment notes, the Court concludes this matter must be remanded for a reevaluation of Dr. Onder's medical opinion.

**B.      Second Assignment of Error: the ALJ's evaluation of Plaintiff's credibility**

In her second assignment of error, Plaintiff argues that the ALJ failed to conduct a proper credibility analysis. Because this Court has already determined that reversal and remand is necessary for a proper evaluation of Plaintiff's treating physician, it need not address Plaintiff's credibility arguments at length. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). However, a proper credibility determination requires consideration of a claimant's subjective complaints in light of the record as a whole. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) ("the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.'"). The record as a whole "includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians

and others, as well as any other relevant evidence contained in the record." *Id.*; *See also* 20

C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).

Here, the ALJ has not considered Plaintiff's subjective complaints in light of the record

as a whole. As described above, the ALJ failed to properly review Plaintiff's treatment history

with Dr. Onder and evaluate his medical opinion. Therefore, on remand, the ALJ will be

required to reassess Plaintiff's credibility in light of a proper consideration of this evidence and

state "specific reasons for the finding on credibility, supported by evidence in the case record."

SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996). And those reasons "must be

sufficiently specific to make clear to [Plaintiff] and to any subsequent reviewers the weight the

adjudicator gave to the individuals statements and the reason for the weight." *Id.*

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be VACATED and this matter REMANDED for further proceedings.


    *s/Jonathan D. Greenberg*    
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 26, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**